**COMAIR, INC., Appellant,**

v.

**Burl HELTON, Hon. Marcel Smith, Administrative Law Judge; and Workers' Compensation Board, Appellees.**

No. 2007–CA–002332–WC.

Court of Appeals of Kentucky.

Nov. 14, 2008.

H. Douglas Jones, Lisa K. Clifton, Florence, KY, for appellant.

Gregory N. Schabell, Covington, KY, for appellee, Burl Helton.

Before CLAYTON, NICKELL, and TAYLOR, Judges.

*OPINION*

NICKELL, Judge.

Comair, Inc. (Comair) has petitioned for review of an opinion of the Workers' Compensation Board (Board) entered October 19, 2007, reversing in part, vacating in part, and remanding the Administrative Law Judge's (ALJ) opinion, order and award of benefits to Burl Helton (Helton). For the following reasons, we affirm the Board's decision.

Helton was employed by Comair as a customer service representative. His duties included operating tugs on the airport tarmac; moving carts; loading and unloading luggage; moving, refueling and cleaning aircraft; filling water reservoirs; and chocking wheels. On October 26, 2004, Helton sustained a work-related left knee injury when exiting the cargo hold of an airplane. Although he initially believed the injury to be minor, Helton quickly realized it was more severe as the pain did not subside. Shortly thereafter, Helton reported the incident to his supervisor. Prior to the injury, Helton had experienced no medical problems with his knees. He testified he had never been placed on work restrictions, curtailed any leisure or work activities, nor sought any medical treatment in relation to his knees. Following the injury, Helton has undergone three surgeries involving his left knee, culminating in a total knee replacement. He has also undergone one surgery to his right knee. During the course of his treatment, Helton was able to return to work for Comair performing light duty for two ninety-day periods but has been unable to continue working.

Helton began his treatment with Dr. Angelo Colosimo (Dr. Colosimo), an orthopedic surgeon, on November 18, 2004. Dr. Colosimo diagnosed a probable medial meniscus tear of the left knee and recommended Helton undergo an MRI.

Comair referred Helton to Dr. John Larkin (Dr. Larkin) for an examination. On November 24, 2004, Dr. Larkin performed a physical examination and diagnosed Helton with a posterior horn and mid-body tear of the medial meniscus of the left knee. Dr. Larkin agreed with Dr. Colosimo regarding the need for an MRI and further recommended Helton return to work only under light duty restrictions.

Helton underwent the recommended MRI later that day. The testing revealed: 1) low-grade tibial collateral ligament sprain; 2) medial compartment and patellofemoral compartment intermediate-grade III chondromalacia; 3) tear of the medial meniscus with degeneration; 4) capsular inflammation of the posteromedial corner

of the knee suggestive of a capsular sprain; 5) a prior Baker cyst which had ruptured; and 6) moderately inflamed prepatellar bursa.

On December 10, 2004, Dr. Colosimo performed a partial medial meniscectomy and removed the torn posterior horn of the medial meniscus. Dr. Colosimo noted a nonreparable tear along the periphery of the medial meniscus. He found Helton's anterior and posterior cruciate ligaments to be intact and described Helton's patellofemoral joint and the lateral compartment of the left knee as "pristine."

On January 27, 2005, Helton had a follow-up appointment with Dr. Colosimo and informed the doctor the superficial pain in his knee had subsided but he was experiencing deeper pain when he put his weight on the knee. Dr. Helton examined the knee and found an eight-degree varus malalignment with isolated medial compartment degenerative changes. Dr. Helton believed these conditions were secondary to the prior surgery and recommended a series of injections to alleviate these conditions. Helton received the injections in April 2005, but improved only minimally. Dr. Colosimo then recommended an additional surgical procedure known as a high tibial osteotomy (HTO).[1]

On June 22, 2005, Helton again saw Dr. Larkin at Comair's request. Dr. Larkin noted the MRI conducted two weeks prior to Helton's surgery indicated grade III patellofemoral chondromalacia, but Dr. Colosimo found no evidence of such damage during the surgery. Dr. Larkin noted slight varus positioning in both knees. He concurred with Dr. Colosimo's recommendation of an HTO, but believed another MRI should be performed before such surgery was undertaken.

Helton returned to Dr. Colosimo on June 28, 2005, and reported continuing knee pain. Upon examination, varus positioning was noted and the HTO was again recommended. Helton underwent the procedure on September 2, 2005. In his operative report, Dr. Colosimo stated Helton had developed the painful tibia vara due to the surgical loss of the meniscus. He later indicated Helton's injury had resulted in significant knee instability and recommended a postoperative knee brace.

Helton's recovery from the HTO surgery was slow. In early 2006, he was prescribed a bone stimulator, knee brace, and was referred to pain management. On March 21, 2006, Dr. Colosimo recommended permanent lifting restrictions. Comair then denied any further liability for Helton's treatment.

Helton subsequently began experiencing difficulties with his right knee. In July 2006, Dr. Colosimo opined any preexisting disease Helton may have had in his left knee had been dormant and asymptomatic prior to the work-related injury. Thus, he

1. According to the Board's opinion, "[a]n 'osteotomy' is a surgical procedure whereby a bone is cut to shorten, lengthen, or change its alignment in order to alter the biomechanics of a joint and modify the force transmission through the joint. Knee osteotomy is commonly used to realign the knee structure to address arthritic damage on one side of the knee. The goal is to shift body weight off the damaged area to the other side of the knee, where the cartilage is still healthy. Osteotomy is used as an alternative treatment to total knee replacement in younger and active patients. An osteotomy procedure can enable younger, active osteoarthritis patients to continue using the healthy portion of their knee thereby delaying the need for a total knee replacement for several years. The most common type of osteotomy performed on arthritic knees is the 'high tibial osteotomy,' which addresses cartilage damage on the inside (medial) portion of the knee. *See http://www.webmd.com/osteoarthritis/Osteotomy-for-osteoarthritis; See* also *http://orthopedics.about.com/od/hipkneearthritis/a/osteotomy.htm.*"

believed all the medical problems related to the left knee were work-related. Dr. Colosimo further opined the right knee pain was directly related to the extended period of injury and prolonged healing of the left knee. He stated Helton had experienced a meniscus tear of the right knee since the surgery due to his compensating for the left knee injury. On September 26, 2006, Dr. Colosimo reiterated his belief Helton's right knee pain was directly related to the earlier injury. He noted Helton needed a total replacement of his left knee, but the right knee would need surgery first.

On October 6, 2006, Helton underwent a right knee arthroscopy with a medial meniscectomy. On December 11, 2006, he underwent a total left knee replacement. Following this surgery, Dr. Colosimo completed a Form 107 medical report and assessed a 20 percent whole body impairment rating for Helton's left knee, and a 9 percent whole body impairment rating for his right knee. Both of these assessments were made pursuant to the American Medical Association's *Guides to the Evaluation of Permanent Impairment* ("AMA Guides"). Further, Dr. Colosimo opined all of Helton's impairment was due to the work-related injury on October 26, 2004, and indicated Helton had no prior active impairment.

On June 4, 2005, Dr. Ronald J. Fadel (Dr. Fadel), an orthopedic surgeon, reviewed Helton's medical records at Comair's request. Dr. Fadel concluded only Helton's medial meniscus tear was work-related and his other health problems were the result of preexisting degenerative changes which could not have arisen in a short time nor been caused by a meniscal tear.

At Comair's request, Dr. Michael Best (Dr. Best) performed an independent medical evaluation (IME) of Helton on April 27, 2006. Dr. Best noted Helton had preexisting degenerative arthritis in his left knee at the time of the initial surgical procedure. He opined the torn meniscus was work-related, but believed Helton's remaining complaints were the result of his preexisting condition and therefore not work-related. Pursuant to the AMA *Guides,* Dr. Best assessed a 1 percent whole body impairment rating for the work-related injury.

Dr. Joseph L. Zerga (Dr. Zerga), a neurologist, conducted an IME of Helton on August 25, 2006. Dr. Zerga found Helton had pain in both knees and it was possible he had "some degenerative changes" in his knees. He opined the October 26, 2004, incident probably aggravated Helton's knee pain.

On November 9, 2006, Dr. Arthur F. Lee (Dr. Lee) conducted an IME of Helton at Comair's request. On December 21, 2006, Dr. Lee reviewed Helton's medical records. Dr. Lee opined the medial meniscus tear was a work-related injury and the surgical repair performed by Dr. Colosimo was the appropriate course of treatment. He further stated the subsequent treatment was performed to alleviate the symptoms from Helton's unrelated preexisting arthritis secondary to congenital tibia vara. Dr. Lee found Helton's right knee injury to be wholly unrelated to the October 26, 2004, event. Dr. Lee limited Helton's need for a total left knee replacement to his arthritic condition and said it had "nothing to do with, or almost nothing to do with his meniscus tear." He opined Helton's right knee meniscus tear resulted from "typical degenerative change." In a subsequent deposition, Dr. Lee stated Helton was "doomed already to have knee problems, it is just a question of when...." He admitted there was no evidence Helton had an active preexisting condition with either knee, only that he

was predisposed to have knee problems. In a supplemental report dated March 20, 2007, Dr. Lee assessed a 1 percent whole body impairment rating for Helton's left knee meniscus tear, and a possible 15 to 30 percent whole body impairment for the total knee replacement based on the AMA *Guides*. Dr. Lee stated he believed only the 1 percent impairment was work-related. He assessed a 1 percent whole body impairment for Helton's right knee pursuant to the AMA *Guides*.

The ALJ ultimately granted Helton an award of income benefits based upon a 1 percent impairment rating. The ALJ declared all medical treatments other than those directly associated with the left knee meniscectomy to be noncompensable. The ALJ was persuaded by the opinions of Drs. Best, Lee, and Fadel which indicated only the left knee meniscus tear was work-related. Although convinced Helton had other medical problems with his knees subsequent to the work-related event, the ALJ did not believe these issues to be work-related nor aroused by that injury from a previously dormant condition. Further, the ALJ found Helton had received all temporary total disability (TTD) benefits to which he was entitled based upon the earlier rulings regarding work-relatedness. The ALJ applied a one multiplier and, under Kentucky Revised Statutes (KRS) 342.730(1)(b), ruled the 1 percent whole body impairment rating became a 0.65 percent permanent impairment rating. Helton's petition for reconsideration was denied and he timely appealed to the Board.

Helton argued the record compelled a finding that his preexisting arthritis and tibia vara were dormant and nondisabling prior to his work injury and were aroused into a disabling state by the injury. He thus argued the ALJ erred in excluding much of his extensive medical treatment as noncompensable. Relying on our decision in *Finley v. DBM Technologies*, 217 S.W.3d 261 (Ky.App.2007), the Board agreed with Helton, finding "Helton's knees were wholly asymptomatic prior to the events of October 26, 2004." The Board stated there was no question Helton had underlying arthritis in both knees because of his preexisting tibia vara. However, the Board opined Helton's condition was dormant, nondisabling, and not impairment-ratable under the AMA *Guides* until after the work injury and subsequent treatment. Thus, pursuant to *Finley* and the long line of cases following *Robinson–Pettet Co. v. Workmen's Compensation Board*, 201 Ky. 719, 258 S.W. 318 (1924), the Board reversed the decision of the ALJ.

The Board found Comair had failed to prove Helton's preexisting condition was active and impairment-ratable prior to the work injury or that it was aggravated by some other intervening cause unrelated to the work injury. In remanding the matter, the Board instructed the ALJ to assess an impairment rating which included the effects of Helton's total knee replacement and to award medical benefits accordingly. The ALJ was further directed to make additional findings regarding Helton's entitlement to TTD benefits, the extent and duration of Helton's disability including his entitlement to permanent total disability benefits, the causation and compensability of Helton's right knee injury, and Helton's entitlement to vocational rehabilitation benefits. Comair timely petitioned this Court for review of the Board's decision.

Comair contends the Board erred in substituting its judgment for that of the ALJ as to the weight and credibility of the evidence. In support of this argument, Comair claims the ALJ's decision was based on substantial evidence, and the

Board's conclusion that the evidence established a direct causal link between Helton's work-related injury and the entirety of his following medical treatment was erroneous. After a careful review of the record, we disagree and affirm the decision of the Board.

■■■ Our function when reviewing a decision made by the Board "is to correct the Board only where the the [sic] Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *Western Baptist Hospital v. Kelly,* 827 S.W.2d 685, 687–88 (Ky.1992). Thus, the "standard of review with regard to a judicial appeal of an administrative decision is limited to determining whether the decision was erroneous as a matter of law." *McNutt Construction/First General Services v. Scott,* 40 S.W.3d 854, 860 (Ky. 2001) (citing *American Beauty Homes v. Louisville & Jefferson County Planning and Zoning Commission,* 379 S.W.2d 450, 457 (Ky.1964)).

■■■ It is undisputed Helton suffered a work-related tear of the medial meniscus of his left knee. It is also undisputed Helton had preexisting arthritic changes in both knees secondary to congenital tibia vara. No evidence was produced indicating Helton's degenerative changes were symptomatic prior to his work-related injury, nor that the changes were impairment-ratable immediately prior to the incident. As correctly noted by the Board, "the burden of proving the existence of a pre-existing [sic] condition falls upon the employer." *Finley, supra,* 217 S.W.3d at 265 (citing *Wolf Creek Collieries v. Crum,* 673 S.W.2d 735, 736 (Ky.App.1984)). It is well-established that "where work-related trauma causes a dormant degenerative condition to become disabling and to result in a functional impairment, the trauma is

the proximate cause of the harmful change; hence, the harmful change comes within the definition of an injury." *McNutt Construction, supra,* 40 S.W.3d at 859. If an impairment is both asymptomatic and not impairment-ratable prior to the work-related injury, it is classified as a preexisting dormant condition. *Finley, supra,* 217 S.W.3d at 265. When such a condition "is aroused into disabling reality by a work-related injury, any impairment or medical expense related solely to the pre-existing [sic] condition is compensable." *Id.* This has been the law of the Commonwealth since 1924. *See Robinson–Pettet Co., supra.*

Our review of the record compels us to hold the Board's decision was correct in finding Comair failed to prove Helton's preexisting condition was active and impairment-ratable immediately prior to his October 26, 2004, work injury. We also agree with the Board that no credible evidence was presented indicating Helton's symptoms were the result of an unrelated intervening cause separate and apart from the work-related injury and resulting surgery.

The Board correctly noted the medical opinions relied upon by the ALJ were silent on the issue of whether Helton's preexisting degenerative changes were active and impairment-ratable prior to the work injury. The remaining medical opinions clearly indicated Helton's preexisting degenerative changes were dormant and asymptomatic prior to the work injury. It is unrefuted Helton suffered from dormant arthritic changes secondary to congenital tibia vara. Therefore, the Board correctly found as a matter of law the ALJ erred in denying Helton compensation for the arousal of his dormant condition. *Finley, supra.* The entirety of Helton's impairment due to his knee injury is compensable, and the Board did not improperly

substitute its judgment for that of the ALJ in so finding. Finally, we hold the Board correctly instructed the ALJ as to the matters to be considered on remand. Comair's arguments to the contrary are without merit and warrant no further discussion.

For the foregoing reasons, the October 19, 2007, opinion of the Board is affirmed.

ALL CONCUR.